James E. **PRICE** et al., Plaintiffs,

v.

**SEABOARD COAST LINE RAILROAD COMPANY, Inc., et al., Defendants.**

Civ. A. No. 68–271.

United States District Court,
N. D. Alabama, S. D.

Sept. 11, 1970.

Ollie Blan, Jr., of Spain, Gillon, Riley, Tate & Ansley, Birmingham, Ala., for plaintiffs.

Drayton T. Scott, of Cabaniss, Johnston, Gardner & Clark and Mr. Jerome A. Cooper, of Cooper, Mitch & Crawford, Birmingham, Ala., and Ross & Kraushaar, Cleveland, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GROOMS, District Judge.

Plaintiffs commenced this action on April 26, 1968, in the Circuit Court for the Tenth Judicial Circuit of Alabama, Equity Division, against the Seaboard Coast Line Railroad Company (Seaboard) seeking a declaratory judgment that certain limitations on the consolidated seniority roster for locomotive engineers on Consolidated Seniority District No. 4 (Western) violated the contracts or agreements between Seaboard and the Brotherhood of Locomotive Engineers (BLE) and therefore should be deleted. The cause was thereafter removed to this court. On January 7, 1969, the complaint was amended to add BLE as a party defendant; to request a permanent injunction directing the defendants to delete the designations on said consolidated seniority roster limiting plaintiffs to yard service and to permit plaintiffs to perform whatever duties as an engineer which they may be qualified to perform and to which they may be entitled by their position on said consolidated seniority roster; and to claim damages against both defendants for breach of contract and against BLE for breach of the statutory duty of fair representation. On March 13, 1970,

during trial of the cause, plaintiffs further amended their complaint to pray that defendants be enjoined to place plaintiffs William L. Brown and Ralph H. Walton on the consolidated engineers' seniority roster on the basis of their date of hire as and seniority position of locomotive firemen on the roster for that craft.

After a trial without jury, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Plaintiffs herein have been, since on or about July 1, 1967, employees of Seaboard in the craft of locomotive engineer. Plaintiff W. L. Brown is, and at all times pertinent hereto, has been a member of BLE and Local Division 684 thereof. Plaintiffs J. E. Collier, Jr., and R. H. Walton are, and at all times material hereto, have been members of BLE and Local Division 779 thereof. Plaintiff J. E. Price is not now a member of BLE, having been expelled from BLE and Local Division 779 thereof in 1953.

2. The defendant Seaboard is a corporation engaged in interstate commerce as a railroad "carrier" as defined in Section 1, Railway Labor Act, 45 U.S.C. § 151, and Section 1 of the Interstate Commerce Act, 49 U.S.C. § 1, and is subject to the provisions of said Acts. Seaboard is licensed to do business and is doing business within the Northern District of Alabama and within the County of Jefferson, State of Alabama.

3. Plaintiffs J. E. Collier, Jr., J. E. Price, W. L. Brown and R. H. Walton were originally employed by the Atlanta, Birmingham and Coast Railroad Company (AB & C) as locomotive firemen on December 26, 1940, May 3, 1941, December 26, 1941, and August 18, 1944, respectively. Each of said plaintiffs established seniority dates as yard engineers on AB & C on September 2, 1942, August 21, 1943, October 13, 1945, and April 21, 1946, respectively.

4. Effective January 1, 1946, the properties of the aforesaid AB & C were merged into the Atlantic Coast Line Railroad Company (ACL) pursuant to authorization of the Interstate Commerce Commission. On July 1, 1967, Seaboard became the merged successor company to ACL and the Seaboard Air Line Railroad Company (SAL).

5. The defendant BLE is a labor organization under the Railway Labor Act and Interstate Commerce Act and engages in collective bargaining in the railroad industry. The BLE is the duly authorized exclusive collective bargaining representative under the Railway Labor Act for the craft or class of engineers in the employ of Seaboard.

6. In 1949, BLE was certified as the collective bargaining representative for the craft of locomotive engineers on the predecessor ACL, including those engineers employed by the former AB & C. Prior to that date, plaintiffs, as locomotive engineers on AB & C, were represented by another union which is not a party to these proceedings, and were subject to the collective bargaining agreements, and the interpretations and rulings thereof, between the AB & C and said other union until BLE and ACL entered into an agreement in 1951 covering said employees.

7. Except as above described for AB & C, collective bargaining agreements between the defendants and the predecessor companies of defendant Seaboard have been in effect for many years governing rates of pay, rules, and working conditions of the employees of the Seaboard in the class or craft of engineers represented by BLE.

8. On July 1, 1967, pursuant to the regulations and orders of the Interstate Commerce Commission, the ACL and SAL merged to form the defendant Seaboard. The employee protective conditions imposed by the Commission and approved by the courts provided for implementing agreements between the Seaboard and the respective employee representatives, including BLE, as to the consolidation of work facilities and employment forces of the predecessor companies.

9. On November 10, 1966, pursuant to the Railway Labor Act and Section 5(2) (f) of the Interstate Commerce Act, the BLE and the aforesaid predecessor companies of Seaboard entered into an agreement entitled "Agreement for Protection of Employees Represented by the Brotherhood of Locomotive Engineers in the Event of Merger of Seaboard and Coast Line Railroads." Said agreement provided, inter alia, for guaranteed earnings and employment for the existing employees of the predecessor companies. In consideration of these promises and in line with the Commission imposed conditions, Section 3 thereof provided for subsequent consolidation of seniority districts and seniority rosters.

10. On June 28, 1967, agreements providing for the consolidation of seniority districts of the predecessor companies were entered into by BLE and said companies, and were entitled "Implementing Agreements Numbers 1, 2, 3, 4, 5, 6." Implementing Agreement Number 4 related to Consolidated Seniority District No. 4, also known as Western District, which district is the subject of this suit. In Article 1, Section 2 of each of said agreements, provision was made for the consolidation of seniority rosters to be implemented in a further agreement, such implementation to be based upon each former district's equity and other related factors. The consolidated seniority rosters were then to be maintained in accordance with the Engineers' Schedule Agreement.

11. On October 4, 1967, the BLE and Seaboard entered into the Engineers' Schedule Agreement to become effective November 1, 1967, except that Articles 26 and 27 were not placed into effect until the seniority rosters were consolidated. Article 25(g) provided that "engineers' seniority will remain as established by agreement of June 26, 1967." Article 48(c) of said agreement further provided, however, that local agreements and understandings on the predecessor railroads would remain in effect and could only be eliminated by further agreement of BLE and Seaboard even when conflicting with the provisions of the Schedule Agreement.

12. On December 19, 1967, the BLE and Seaboard entered into an agreement entitled "Implementation of Article 1, Section 2, District Agreements 1 Through 6, Signed June 28, 1967," which provided for the consolidation of seniority rosters of locomotive engineers pursuant to agreed formulas contained therein. By its terms, said agreement was to become effective January 16, 1968. By reason of mutual agreements between defendants and as a result of litigation, the consolidated roster for Seniority District No. 4 (Western) was not placed into effect until 12:01 a. m., February 2, 1968.

13. Prior to the merger of the SAL and ACL to form defendant Seaboard, there were separate seniority rosters on the SAL for road engineers and yard engineers. From on or before 1941, employees of SAL, who subsequently became locomotive engineers, were hired as locomotive firemen for yard service or for road service. Said individuals, whether in separate road or yard service, took the necessary qualification examinations, which were similar except for minor deviations relating to the type of service performed. Upon completion of the third year promotional examination and upon completion of the first regular assignment as locomotive engineer, which could be some years after said examination, SAL firemen would be promoted and placed on the engineers' seniority roster in the class of service for which they were originally hired, road or yard, for that former seniority district. The individual had no right of selection to road or yard service.

14. On the ACL, however, excepting the former Brunswick and Birmingham seniority districts composed of former AB & C engineers, engineers were qualified for both road and yard seniority and upon promotion from the craft of firemen in three or more years were positioned on one seniority roster for the

craft of locomotive engineers in each former seniority district.

15. In order to consolidate the separate seniority rosters of ACL and SAL, the aforesaid agreement of December 19, 1967, first provided for the consolidation of the separate road and yard engineers' seniority rosters on the SAL, using the individual's date of hire as a fireman except where said date would permit the individual to "run around" an engineer having a higher existing rank on the engineer seniority roster. On June 19, 1967, the local chairmen of the General Committee of Adjustment of the BLE for the SAL met in special session in Jacksonville, Florida, and agreed upon the above formula for consolidating the separate road and yard seniority rosters on the SAL.

16. Next, in order to consolidate the rosters between SAL and ACL engineers, said agreement of December 19, 1967, established the specific elements to be considered in the consolidation of those rosters under the work equity or percentage block method selected by the local chairmen of the General Committees of Adjustment of the BLE for the ACL and SAL, who were consulted through jointly held sessions in Jacksonville, Florida, from June 19–24, 1967. These elements were:

1. Job starts of all engineers within each former seniority district.

2. Miles paid for, including engine hours of all engineers, within each former seniority district.

3. Earnings of all engineers within each seniority district.

4. Number of men on the January 1, 1966, and July 1, 1966, seniority rosters of each former seniority district.

As to each former seniority district, its equity in the work of the new consolidated seniority district was determined on the basis of its percentage of the total work performed in the former districts, as established by consideration of the four elements prescribed. Section 35 of the Standing Rules of the BLE Constitution, which section sets forth the exclusive procedures governing the handling of merger related problems, including seniority, provides for the use of these four elements in determining the proper ratio for consolidating seniority rosters on an equitable basis in the event of merger.

17. Having determined the percentage equity of each former seniority district in the manner described above the agreement of December 19, 1967, provided for the dovetail blocking of the former seniority rosters into one consolidated seniority roster for each of the six newly-created seniority districts, including Seniority District No. 4 (Western). The formed rosters were consolidated as prescribed in said agreement. In transferring the names from the former seniority rosters of engineers to the consolidated rosters on each of the six consolidated districts, each individual was inserted thereon in accordance with the positions delegated to his former district on the basis of its equity. As between the engineers as a group on the former district, each individual was placed thereon in relation to his relative position to the other engineers in the former district; that is, the individual's date of hire as a fireman was used except where said date would permit the individual to "run around" an engineer having a higher existing rank on the engineers' seniority roster for his former district. In view of the percentage block formula, the date of hire as firemen was not relevant as to the position on the consolidated roster between individuals from different seniority districts.

18. Dovetail percentage blocking, as used by BLE and Seaboard, places each engineer involved in the same relative standing or position in regard to work opportunity as he was in prior to the merger. Accordingly, said method constitutes a fair and reasonable method by which to consolidate rosters.

19. Uniformly throughout the merged system, engineers, whether from ACL and SAL, carried certain restrictions on their seniority, such as disability, physi-

cal disqualification, disciplinary limitations, etc. Some limitations were noted on the seniority rosters; others were carried in the individual's personnel records.

20. As to the consolidation of the seniority rosters in Seniority District No. 4 (Western), the agreement of December 19, 1967, provided for the application of the same formula and principles; except that under the old AB & C–ACL agreements and practices, those former ACL engineers who were Fixture Yard Engineers on the old ACL Birmingham and Brunswick Districts would have yard seniority rights only in the consolidated district, and those former ACL engineers on the old Birmingham and Brunswick Districts who held road rights only would have road seniority rights only in the consolidated district. The agreement provided that a (Y) symbol would be placed after the names of the Fixture Yard Engineers and an (R) symbol after the names of the engineers holding road rights only. The agreement further permitted the engineers with a (Y) symbol after their name to take the progressive and promotional examinations to qualify for road service. Upon satisfactory completion of those examinations, they would receive an additional seniority position on the bottom of the consolidated seniority roster with an (R) symbol after their name.

21. The consolidated roster for Seniority District No. 4 (Western) subsequently placed in effect, and presently in effect, bears a (Y) symbol after the names of the four plaintiffs and five other yard fixture engineers, indicating they hold seniority as engineers in yard service only. The names of five other engineers on the consolidated roster for Seniority District No. 4 (Western) carry an (R) symbol after their name, indicating they hold seniority in road service only. One of the individuals carrying said symbol is an officer of defendant BLE.

22. Prior to the Seaboard merger and thereafter, plaintiffs performed yard service only; and plaintiffs have not availed themselves of the opportunity to obtain road seniority entitling them to perform road service.

23. From 1921 to June 1, 1941, the locomotive engineers on the former AB & C were not represented by any collective bargaining representative. During that period of time, firemen were promoted out of sequence of ranking as a fireman into ranks of engineer. After June 1, 1941, when the other union previously mentioned became collective bargaining representative of the crafts of locomotive engineers and of firemen, said practice or custom continued. This practice and custom also existed on the SAL and ACL, but was altered by BLE in 1953 as to all future promotions. It is due to this practice and custom that the agreements between defendants provided in the consolidation of rosters for the use of the individual's date of hire as a fireman except where it would throw him out of his relative standing as engineer between those engineers on his former seniority district.

24. In addition to the above practice or custom, during the period of 1921 to June 1, 1941, locomotive firemen on AB & C (but not those firemen on ACL or SAL) were first promoted to yard engineer and were subsequently further promoted to road engineer with separate seniority dates on the separate seniority rosters maintained for each class of service, road and yard. This additional practice or custom prevailed on AB & C until 1950, at which time individuals being promoted received a similar seniority date for both classes of service. Thus, from June 1, 1941, through 1949, the four plaintiffs, and other AB & C employees hired as firemen, were promoted to engineers in the same manner previously used, and could hold seniority, with separate seniority dates or standing, in yard service only, in road service only, or a combination of both road and yard. The only exception provided for in the agreement between AB & C and the other union pertained to engineers hired as such, i. e., hired engineers, said persons receiving simultane-

ous seniority dates as firemen, yard engineers and road engineers.

25. The plaintiffs, and other firemen on the AB & C promoted to engineer, were permitted to take an examination for promotion to yard engineer within two years or less from their date of hire as firemen, and upon successful completion of said examination, to be placed on the seniority roster for yard engineers. Usually, after one year after promotion to yard engineer, said individuals could, if they so desired, take another qualifying and promotion examination, which, if passed, would allow them a separate seniority date on the roster for road engineers. No individual was required to take said examinations for promotion to road engineer. The seniority rosters in effect at all times material hereto clearly substantiate these practices and customs.

26. Plaintiff J. E. Price either took and did not pass or failed to complete the required examination for promotion to road engineer. In May, 1946, plaintiff J. E. Price declined to take the examination for promotion to road engineer and has never taken said examination. Plaintiff Price continued in service as a yard engineer until October, 1946, marking off, and did not return to service as yard engineer until April, 1949. On January 12, 1945, plaintiff J. E. Collier, on April 1, 1946, plaintiff W. L. Brown, and on January 11, 1947, plaintiff R. H. Walton executed waivers of road seniority, as did others of the engineers bearings a (Y) symbol after their name on the consolidated seniority roster for Seniority District No. 4 (Western).

27. None of plaintiffs protested the seniority rosters posted, or filed any grievance to be handled under the grievance procedures provided in the applicable collective bargaining agreements. In November, 1951, however, plaintiff J. E. Price first sought the assistance of defendant BLE concerning the separate road and yard seniority rosters by requesting the General Committee of BLE on the former ACL to adjust the senior-

ity rosters on the former AB & C's Birmingham District. This request was refused by said General Committee. In 1953, plaintiff Price appealed from this refusal to the then Grand Chief Engineer of the BLE, who refused to entertain the appeal on the ground that the time limitations on appeals had expired. This ruling of the Grand Chief Engineer was sustained by the delegates to the 1953 BLE Convention.

28. In 1954, plaintiff J. E. Price filed a grievance with the proper officials of ACL claiming seniority as a road engineer, which was declined. On October 31, 1955, plaintiff Price submitted that grievance, including reference to the other plaintiffs in this cause, to the National Railroad Adjustment Board, First Division, pursuant to Section 3 of the Railway Labor Act, 45 U.S.C. § 153. On May 25, 1961, the First Division of the Adjustment Board, with neutral referee participating, dismissed plaintiff Price's claim on the basis that it was barred by said plaintiff's failure to make complaint with the carrier for eleven years after his name first appeared on the seniority roster as a yard engineer in 1943.

29. After the execution of the December 19, 1967 agreement, plaintiff J. E. Collier filed an appeal within the defendant BLE, which was denied on the basis that the procedures of Section 35, Standing Rules of the BLE Constitution, provided the exclusive method for handling merger related issues, including seniority.

30. The defendants herein, and each of them did not enter into the agreements pertinent hereto for arbitrary or discriminatory purposes and did not apply the provisions thereof in such manner as to violate the duty of defendant BLE, as collective bargaining representative under the Railway Labor Act, to represent fairly all of the employees in the craft of locomotive engineers on the Seaboard, or its predecessor companies.

31. The considerations used in reaching the agreement of December 19, 1967, and in preparing the engineers' seniority roster for Seniority District No. 4 (Western), were relevant and nonarbitrary. The (Y) and (R) symbols after the names of the plaintiffs and others on said roster were not inserted for hostile or invidious reasons. Those considerations, including among others the seniority rosters, personnel records, the waivers of road seniority and declinations as to taking the promotional examinations for road service, the differences in examinations and promotional practices, and the award of the Adjustment Board, all appear to have been reasonable considerations which in fact led to a good faith solution to a situation concerning which there could not be complete satisfaction to every individual involved. The defendants did not enter into any arrangement for the purpose of benefiting others at the expense of the plaintiffs, nor did they seek to or, in fact, inflict any detriment upon plaintiffs.

32. No provision of the December 19, 1967 agreement for the consolidation of seniority rosters in the Western District conflicts with or is inconsistent with any provision of the "Agreement For Protection of Employees Represented by the Brotherhood of Locomotive Engineers in the Event of Merger of Seaboard and Coast Line Railroads" executed November 10, 1966.

33. None of the plaintiffs have been, are or are subject to being put in a "worse position with respect to compensation, rules, working conditions, fringe benefits or rights and privileges pertaining thereto" within the meaning of Section 2(b) of the aforementioned agreement of November 10, 1966.

34. No provision of the December 19, 1967 agreement for the consolidation of seniority rosters in the Western District conflicts with or is inconsistent with any provision of the Implementing Agreement for the Western District executed June 28, 1967. Specifically no provision of said December 19, 1967 agreement conflicts with or is inconsistent with Article I, Section 2, "Seniority Rosters," of said Implementing Agreement.

35. No provision of the December 19, 1967 agreement for the consolidation of seniority rosters in the Western District conflicts with or is inconsistent with any provision of the Engineers Schedule Agreement executed October 4, 1967 or any addendum thereto.

36. At no time prior to the execution of the December 19, 1967 agreement for the consolidation of seniority rosters in the Western District did the bargaining parties execute any agreement contemplating that plaintiffs' seniority would not be restricted to yard seniority on the consolidated seniority roster for the Western District.

37. No racial discrimination is in any way involved in this case.

## CONCLUSIONS OF LAW

A. This court has jurisdiction of this suit and of the parties. The claim asserted arises under the Railway Labor Act, 45 U.S.C. 151 et seq., and under the Interstate Commerce Act, 49 U.S.C. § 1 et seq. Jurisdiction of this suit exists under 28 U.S.C. §§ 1331, 1337.

B. The employee protection conditions, of which the Implementation Agreement dated December 19, 1967, is a part, provide protection for employees of Seaboard in the craft of locomotive engineers which is far in excess of the minimal requirements for protection contained in the orders of the Interstate Commerce Commission approving the merger and in the decision of the three-judge court which reviewed and approved those orders. Florida East Coast Railway Co. et al. v. United States, 259 F.Supp. 993, aff'd, 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285 (1967).

C. The duty and the scope of the discretion of union representatives in the bargaining process has been variously but cogently stated in certain landmark cases.

In Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), the court held:

"Their statutory obligation to represent all members of an appropriate unit requires them to make an honest effort to serve the interests of all of those members, without hostility to any. * * *

"The bargaining representative, whoever it may be, is responsible to, and owes complete loyalty to, the interests of all whom it represents. * * * Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion."

In Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), the court stated:

"The undoubted broad authority of the union as exclusive bargaining agent in the negotiation and administration of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation. * * *

"But we are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another. * * * Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes."

In Vaca v. Sipes, Admr., 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the court ruled that:

"A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith. See Humphrey v. Moore, supra; Ford Motor Co. v. Huffman, supra."

In Thompson v. Brotherhood of Sleeping Car Porters, 316 F.2d 191 (4th Cir. 1963), the court pointed out that "disparate treatment in representation cannot be tolerated" and that "any discrimination in treatment must be based upon relevant, non-invidious distinctions."

See opinion of Judge Robert R. Merhige, Jr. in Cole v. Seaboard Coast Line Railroad Company, No. 5614, in the Eastern District of Virginia.

Under the facts of this case and in the light of these principles, the Court concludes that the defendants did not enter into the agreements involved herein for arbitrary or discriminatory purposes; that defendants did not apply the provisions thereof in such a manner as to violate the duty of fair representation; that the method used for consolidating seniority rosters through dovetail percentage blocking was fair and reasonable; that the procedure of inserting the names of the engineers on the consolidated seniority rosters on the basis of their date of hire as a fireman except where that basis would alter their relative standing as locomotive engineers between the employees in the same seniority district was uniformly and fairly applied; and that the placing of a (Y) or (R) symbol after the names of the plaintiffs and others similarly situated was based on relevant and not hostile or unlawful considerations. All employees in the craft of locomotive engineers were represented fairly and without hostile discrimination. Under the reasonable range of discretion permitted the collective bargaining representative, the

defendant BLE negotiated and applied the agreements in accordance with its duty of fair representation.

D. The December 19, 1967, agreement for the consolidation of seniority rosters in the Western District is a valid collective bargaining agreement duly negotiated upon proper authority by both the Seaboard and BLE.

In light of the foregoing findings of fact and conclusions of law, the Court is of the opinion that the relief prayed should be denied and judgment entered for defendants herein.