## FORD MOTOR CO. *v.* HUFFMAN ET AL.

NO. 193.

Argued December 18–19, 1952.—Decided April 6, 1953.

*William T. Gossett* argued the cause for petitioner in No. 193. With him on the brief were *L. Homer Surbeck* and *Richard W. Hogue, Jr.*

*Harold A. Cranefield* argued the cause for petitioner in No. 194. With him on the brief were *Lowell Goerlich* and *Sol Goodman.*

*Herbert H. Monsky* argued the cause for respondents. With him on a brief was *Samuel M. Rosenstein* for Huffman, respondent.

Briefs of *amici curiae* urging reversal were filed by *Solicitor General Cummings, George J. Bott, David P. Findling* and *Mozart G. Ratner* for the National Labor Relations Board; and by *Nicholas Kelley, Francis S. Bensel* and *Hancock Griffin, Jr.* for the Chrysler Corporation, in Nos. 193 and 194; and by *Arthur J. Goldberg* for the Congress of Industrial Organizations in No. 194.

MR. JUSTICE BURTON delivered the opinion of the Court.

In these cases we sustain the validity of collective-bargaining agreements whereby an employer, in determining relative seniority of employment among its employees, gives them credit for pre-employment military service as well as the credit required by statute for post-employment military service.[1]

These proceedings were begun in the United States District Court for the Western District of Kentucky by respondent Huffman, acting individually and on behalf of a class of about 275 fellow employees of the Ford Motor Company, petitioner in Case No. 193 (here called Ford). His complaint is that his position, and that of each member of his class, has been lowered on the seniority roster at Ford's Louisville works, because of certain provisions in collective-bargaining agreements between Ford and the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, CIO, petitioner in Case No. 194 (here called International). He contends that those provisions have

---

[1] Where the context permits, "military service" in this opinion includes service in the land or naval forces or Merchant Marine of the United States or its allies.

violated his rights, and those of each member of his class, under the Selective Training and Service Act of 1940, as amended.[2] He contends also that International's acceptance of those provisions exceeded its authority as a collective-bargaining representative under the National Labor Relations Act, as amended.[3] He asks, accordingly, that the provisions be declared invalid insofar as they prejudice the seniority rights of members of his class, and that appropriate injunctive relief be granted against Ford and International. After answer, both sides asked for summary judgment.[4]

The District Court dismissed the action without opinion but said in its order that it was "of the opinion that the collective bargaining agreement expresses an honest desire for the protection of the interests of all members of the union and is not a device of hostility to veterans. The Court finds that said collective bargaining agreement

[2] 54 Stat. 890, 56 Stat. 724, 58 Stat. 798, 60 Stat. 341, 50 U. S. C. App. § 308.

[3] 49 Stat. 452, 61 Stat. 140, 65 Stat. 601, 29 U. S. C. (Supp. V) §§ 157–159.

[4] In No. 194, International also questions the jurisdiction of the District Court. International recognizes that one issue in the case is whether it engaged in an unfair labor practice when it agreed to the allowance of credit for pre-employment military service in computations of employment seniority. It then argues that the National Labor Relations Act, as amended, 61 Stat. 146, 29 U. S. C. (Supp. V) § 160 (a), vests the initial jurisdiction over such an issue exclusively in the National Labor Relations Board. This question was not argued in the Court of Appeals nor mentioned in its opinion and, in view of our position on the merits, it is not discussed here. Our decision interprets the statutory authority of a collective-bargaining representative to have such breadth that it removes all ground for a substantial charge that International, by exceeding its authority, committed an unfair labor practice. As to a somewhat comparable question considered in connection with the Railway Labor Act, see *Tunstall* v. *Brotherhood of Locomotive Firemen*, 323 U. S. 210; *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192, 204–207.

sets up a seniority system which the Court deems not to be arbitrary, discriminatory or in any respect unlawful." The Court of Appeals for the Sixth Circuit reversed, one judge dissenting. 195 F. 2d 170. Ford and International filed separate petitions for certiorari seeking to review the same decision of the Court of Appeals. We granted both because of the widespread use of contractual provisions comparable to those before us, and because of the general importance of the issue in relation to collective bargaining. 344 U. S. 814.

The pleadings state that Huffman entered the employ of Ford September 23, 1943, was inducted into military service November 18, 1944, was discharged July 1, 1946, and, within 30 days, was reemployed by Ford with seniority dating from September 23, 1943, as provided by statute.[5] It does not appear whether the other members of his class are veterans but, like him, all have seniority computed from their respective dates of employment by Ford.

The pleadings allege further that Huffman and the members of his class all have been laid off or furloughed from their respective employments at times and for

---

[5] "SEC. 8. . . .

"(b) In the case of any such person who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ of any employer and who (1) receives such certificate [of satisfactory completion of his period of training and service], (2) is still qualified to perform the duties of such position, and (3) makes application for reemployment within ninety days after he is relieved from such training and service . . .

. . . . .

"(B) if such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so; . . . ." 54 Stat. 890, 58 Stat. 798, 50 U. S. C. App. § 308 (b) (B).

periods when they would not have been so laid off or furloughed except for the provisions complained of in the collective-bargaining agreements. Those provisions state, in substance, that after July 30, 1946, in determining the order of retention of employees, all veterans in the employ of Ford "shall receive seniority credit for their period of service, subsequent to June 21, 1941 in the land or naval forces or Merchant Marine of the United States or its allies, upon completion of their probationary period" of six months.[6]

The effect of these provisions is that whereas Huffman's seniority, and that of the members of his class, is com-

---

[6] Article VIII of a supplementary agreement between Ford and International, dated July 30, 1946, contained the following:

"Section 13— . . . .

.          .          .          .          .

"(c) *Any veteran of World War II who was not employed by any person or company at the time of his entry into the service of the land or naval forces or the Merchant Marine* and who is a citizen of the United States and served with the allies and who has been honorably discharged from such training and service and *who is hired by the company after he is relieved from training and service* in the land or naval forces or after completion of service in the Merchant Marine *shall, upon having been employed for six (6) months and not before, receive seniority credit for the period of such service subsequent to June 21, 1941,* provided:

"(1) Such veteran must apply for employment within ninety (90) days from the time he is relieved from such training or service in the land or naval forces or the time of his completion of such service in the Merchant Marine, and must obtain such employment within twelve (12) months from the time he is relieved from such training and service in the land or naval forces or the time of his completion of such service in the Merchant Marine.

"(2) Such veteran shall not have previously exercised his right in any plant of this or any other company.

"(3) A veteran so employed shall submit his service discharge papers to the company at the end of aforesaid probationary period of employment and the company shall place thereon in permanent form a statement showing that the veteran has exercised this right,

puted from their respective dates of employment by Ford and they have been credited with their subsequent military service, if any, yet in some instances they are now surpassed in seniority by employees who entered the employ of Ford after they did but who are credited with certain military service which they rendered before their employment by Ford.[7]

---

such statement to be signed by representatives of the company and the Union, and a copy thereof placed in the employee's record and a copy furnished to the Union.

"(d) It is further understood and agreed that, regardless of any of the foregoing, *all veterans in the [employ] of the company at the time the Contract is thus amended shall receive seniority credit for their period of service, subsequent to June 21, 1941 in the land or naval forces or Merchant Marine of the United States or its allies, upon completion of their probationary period."* (Emphasis supplied.)

The above provisions were continued in effect, in substantially identical form, in an agreement of August 21, 1947. An agreement of September 28, 1949, provided:

"Section 12. . . . .

.      .      .      .      .

"(c) Any employee who, prior to the effective date of this Agreement, has received the seniority credit provided for in Article VIII, Section 13 (c) or (d) of the Agreement between the Company and the Union dated August 21, 1947, or the comparable provision in the Supplementary Agreement between the Company and the Union dated July 30, 1946, shall continue to receive such seniority credit."

[7] On Huffman's return to Ford in July, 1946, his employment seniority, including his military service, dated from September 23, 1943. It totaled about 33 months, including about 14 months of pre-service company employment and 19 of post-employment military service. An example of a veteran who, due to the agreements before us, outranks Huffman in employment seniority is one who entered military service July 1, 1943, without any prior employment, served honorably until discharged March 1, 1945, and, thereafter, has been employed continuously by Ford, including six months of satisfactory probationary employment. His seniority dates from July 1, 1943. By July 1, 1946, it totaled 36 months, including 20 months of pre-employment military service, and 16 of post-service company em-

Respondent contended in the Court of Appeals that allowance of credit for pre-employment military service was invalid because it went beyond the credit prescribed by the Selective Training and Service Act of 1940. That argument was rejected unanimously. 195 F. 2d 170, 173. It has not been pressed here. There is nothing in that statute which prohibits allowing such a credit if the employer and employees agree to do so. The statutory rights of returning veterans are subject to changes in the conditions of their employment which have occurred in regular course during their absence in military service, where the changes are not hostile devices discriminating against veterans. *Aeronautical Lodge* v. *Campbell,* 337 U. S. 521; and see *Trailmobile Co.* v. *Whirls,* 331 U. S. 40; *Fishgold* v. *Sullivan Drydock & Repair Corp.,* 328 U. S. 275. See also, *Oakley* v. *Louisville & N. R. Co.,* 338 U. S. 278, as to a veteran's seniority status more than one year after his reemployment.

On the other hand, the second objection raised by respondent was sustained by a majority of the members of the Court of Appeals. This objection was that the authority of International, as a certified bargaining representative, was limited by statute and was exceeded when International agreed to the provisions that are before us.

The authority of every bargaining representative under the National Labor Relations Act, as amended, is stated in broad terms:

"SEC. 7. Employees shall have the right to self-organization, to form, join, or assist labor organiza-

ployment. However, except for the collective-bargaining agreements, Huffman would then have outranked such a veteran by about 17 months, although Huffman's military service totaled one month less, his employment by Ford two months less and his combined military service and company employment three months less than that of such a veteran.

tions, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of *collective bargaining or other mutual aid or protection* . . . .

. . . . .

"SEC. 9. (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of *collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment:* . . . ." (Emphasis supplied.) 61 Stat. 140, 143, 29 U. S. C. (Supp. V) §§ 157, 159 (a).

In the absence of limiting factors, the above purposes, including "mutual aid or protection" and "other conditions of employment," are broad enough to cover terms of seniority. The National Labor Relations Act, as passed in 1935 and as amended in 1947, exemplifies the faith of Congress in free collective bargaining between employers and their employees when conducted by freely and fairly chosen representatives of appropriate units of employees. That the authority of bargaining representatives, however, is not absolute is recognized in *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192, 198–199, in connection with comparable provisions of the Railway Labor Act. Their statutory obligation to represent all members of an appropriate unit requires them to make an honest effort to serve the interests of all of those members, without hostility to any. *Id.,* at 198, 202–204; *Tunstall* v. *Brotherhood of Locomotive Firemen,* 323 U. S. 210, 211; *Brotherhood of Railroad Trainmen* v. *Howard,* 343 U. S. 768.

Any authority to negotiate derives its principal strength from a delegation to the negotiators of a discre-

338

tion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented. A major responsibility of negotiators is to weigh the relative advantages and disadvantages of differing proposals. A bargaining representative, under the National Labor Relations Act, as amended, often is a labor organization but it is not essential that it be such. The employees represented often are members of the labor organization which represents them at the bargaining table, but it is not essential that they be such. The bargaining representative, whoever it may be, is responsible to, and owes complete loyalty to, the interests of all whom it represents. In the instant controversy, International represented, with certain exceptions not material here, all employees at the Louisville works, including both the veterans with, and those without, prior employment by Ford, as well as the employees having no military service. Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

Compromises on a temporary basis, with a view to long-range advantages, are natural incidents of negotiation. Differences in wages, hours and conditions of employment reflect countless variables. Seniority rules governing promotions, transfers, layoffs and similar matters may, in the first instance, revolve around length of competent service. Variations acceptable in the discretion of bargaining representatives, however, may well include dif-

ferences based upon such matters as the unit within which seniority is to be computed, the privileges to which it shall relate, the nature of the work, the time at which it is done, the fitness, ability or age of the employees, their family responsibilities, injuries received in course of service, and time or labor devoted to related public service, whether civil or military, voluntary or involuntary. See, e. g., *Hartley* v. *Brotherhood of Clerks*, 283 Mich. 201, 277 N. W. 885; and see also, Williamson & Harris, Trends in Collective Bargaining (1945), 100–103.

The National Labor Relations Act, as amended, gives a bargaining representative not only wide responsibility but authority to meet that responsibility. We have held that a collective-bargaining representative is within its authority when, in the general interest of those it represents, it agrees to allow union chairmen certain advantages in the retention of their employment, even to the prejudice of veterans otherwise entitled to greater seniority. *Aeronautical Lodge* v. *Campbell, supra,* at 526–529.

The public policy and fairness inherent in crediting employees with time spent in military service in time of war or national emergency is so clear that Congress, in the Selective Training and Service Act of 1940, required some credit to be given for it in computing seniority both in governmental and in private employment. See note 5, *supra.* Congress there prescribed that employees who left their private civilian employment to enter military service should receive seniority credit for such military service, provided their prior civilian employment, however brief, was bona fide and not on a temporary basis. There is little that justifies giving such a substantial benefit to a veteran with brief prior civilian employment that does not equally justify giving it to a veteran who was inducted into military service before having a chance to enter any civilian employment, or to a veteran who never worked

340

for the particular employer who hired him after his return from military service. The respective values of all such veterans, as employees, are substantially the same. From the point of view of public policy and industrial stability, there is much to be said, especially in time of war or emergency, for allowing credit for all military service. Any other course adopts the doubtful policy of favoring those who stay out of military service over those who enter it.

The above considerations took concrete form in the Veterans' Preference Act of 1944 which added the requirement that credit for military service be given by every civilian federal agency, whether the military service preceded or followed civilian employment.[8] Apparently recognizing the countless variations in conditions affecting private employment, Congress, however, did not make credit for such pre-employment military service compulsory in private civilian employment. A little later, the Administrator of the Retraining and Reemployment Administration of the United States Department of Labor assembled a representative committee to recommend principles to serve as guides to private employers in their employment of veterans and others.[9] Among 15 princi-

---

[8] "SEC. 12. In any reduction in personnel in any civilian service of any Federal agency, competing employees shall be released in accordance with Civil Service Commission regulations which shall give due effect to tenure of employment, military preference, length of service, and efficiency ratings: *Provided,* That the length of time spent in active service in the armed forces of the United States of each such employee shall be credited in computing length of total service: . . . ." 58 Stat. 390, 5 U. S. C. § 861.

[9] This "Committee of Nine" consisted of representatives from the Business Advisory Council to the Secretary of Commerce, National Association of Manufacturers, U. S. Chamber of Commerce, American Federation of Labor, Congress of Industrial Organizations, Railway Labor Executives' Association, American Legion, Disabled American Veterans and Veterans of Foreign Wars.

ples developed by that committee, and "wholeheartedly" endorsed by the Secretary of Labor, in 1946, were the following:

"8. All veterans having reemployment rights under Federal statutes should be accorded these statutory rights *as a minimum*.

· · · · ·

"13. Newly hired veterans who have served a probationary period and qualified for employment should be allowed seniority credit, at least for purposes of job retention, equal to time spent in the armed services plus time spent in recuperation from service-connected injuries or disabilities either through hospitalization or vocational training." [10]

The provisions before us reflect such a policy.[11] It

---

[10] Reemployment of Veterans Under Collective Bargaining, United States Department of Labor, Bureau of Labor Statistics, October, 1947, Statement of Employment Principles dated October 7, 1946, App. D, pp. 46–48; and see Bulletin of Retraining and Reemployment Administration, United States Department of Labor, October 10, 1946, p. 5; Harbison, Seniority Problems During Demobilization and Reconversion, Industrial Relations Section, Department of Economics and Social Institutions, Princeton University (1944) 12–14.

[11] Collective Bargaining Provisions—Seniority, Bull. No. 908–11, United States Department of Labor, Bureau of Labor Statistics (1949), quotes many seniority clauses as examples of those then in use and including many factors other than length of employment. Among those quoted is the following:

"61. *Veteran Not Previously Employed Given Seniority Credit for Time Spent in Armed Forces*

"Any veteran of World War II who has been discharged, other than dishonorably, from the armed forces of the United States and who immediately prior to his acceptance in the armed forces was not previously employed by [name of company] and who is employed by [name of company] within twelve (12) months after his discharge, provided it is his first place of employment after his discharge, shall

342

is not necessary to define here the limits' to which a col-
lective-bargaining representative may go in accepting
proposals to promote the long-range social or economic
welfare of those it represents. Nothing in the National
Labor Relations Act, as amended, so limits the vision and
action of a bargaining representative that it must dis-
regard public policy and national security. Nor does
anything in that Act compel a bargaining representative
to limit seniority clauses solely to the relative lengths of
employment of the respective employees. *Aeronautical
Lodge* v. *Campbell, supra,* at 526, and 528–529, n. 5. For
examples of negotiated provisions protecting veterans
from loss of seniority upon their return to private civilian
employment, recognized by the National War Labor
Board as coming within the proper scope of collective
bargaining, in 1945, see, *In re American Can Co.,* 27 War
Lab. Rep. 634, 28 War Lab. Rep. 764, and *In re Firestone
Tire & Rubber Co.,* 24 War Lab. Rep. 322, 28 War Lab.
Rep. 483. See also, Bureau of National Affairs, Inc., Col-
lective Bargaining Contracts (1941), 369 *et seq.*

The provisions before us are within reasonable bounds
of relevancy. They extended but slightly, during a
period of war and emergency, the acceptance of credits
for military service under circumstances where compara-
ble credit already was required, by statute, in favor of
all who had been regularly employed by Ford before
entering military service. These provisions conform to
the recommendation of responsible Government officials
and round out a statutory requirement which, unless so
rounded out, produces discriminations of its own. A
failure to adopt these provisions might have resulted in

take his place on the seniority list after completing the sixty (60)
day trial period. His seniority shall be computed from the day of
his acceptance into the armed forces. However, no veteran covered
by this section shall have seniority prior to December 7, 1941."
P. 13.

more friction among employees represented by International than did their adoption.

The several briefs of *amici curiae,* filed here by consent of all parties, demonstrate the widespread acceptance and relevance of the type of provisions before us.

We hold that International, as a collective-bargaining representative, had authority to accept these provisions. Accordingly, we find no ground sufficient to establish the invalidity of the provisions before us or to sustain an injunction against either petitioner. In accord: *Haynes* v. *United Chemical Workers,* 190 Tenn. 165, 228 S. W. 2d 101.

The judgment of the Court of Appeals which reversed that of the District Court therefore is reversed. The judgment of the District Court is affirmed and the cause is remanded to it.

*Reversed and remanded.*