UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA (UE), Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Newell Porcelain Company, Incorporated, Intervenor.

No. 92–1791.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 2, 1992.

Decided Feb. 16, 1993.

Mary E. Leary, Gen. Counsel, United Elec., Radio and Machine Workers of America, Pittsburgh, PA, argued, for petitioner.

Angela Washington, N.L.R.B., Washington, DC, argued (Jerry M. Hunter, Gen. Counsel, Yvonne T. Dixon, Acting Deputy Gen. Counsel, Nicholas E. Karatinos, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Charles Donnelly, Supervisory Atty., Vincent J. Falvo, Jr., on the brief), for respondent.

Victor T. Geraci, Buckingham, Doolittle & Burroughs, Cleveland, OH, argued (John T. Billick, on the brief), for intervenor.

Before WILKINSON and NIEMEYER, Circuit Judges, and MORGAN, United States District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

WILKINSON, Circuit Judge:

This petition for review of a National Labor Relations Board order raises questions about an employer's duty to bargain with a union when confusion exists over whether the demand to bargain has been made by the certified bargaining representative. The NLRB found that the employer did not have to bargain when it became confused about whether the demand to bargain came from a union's local affiliated chapter, which was the certified bargaining representative, or the parent international union, which was not certified. Petitioner argues that substantial evidence does not support a finding of confusion, and that the Board also erred in finding that the employer had no duty to bargain. We disagree with both contentions and thus deny the petition for review.

## I.

In May of 1990, workers at Newell Porcelain Company in Newell, West Virginia, selected the Independent Porcelain Workers Union (the "IPWU") as their collective bargaining representative. In June of 1990, the IPWU, an unaffiliated local union, was duly certified, and negotiations with the Company began. Through nineteen collective bargaining sessions over the next ten months, the two sides failed to agree upon a contract. They tentatively agreed on some smaller issues, such as the union's recognition clause, but reached no agreement on the major issues of wages, health benefits, and pensions.

Spurred by its failure to negotiate a contract, the IPWU began to seek affiliation with a larger, more powerful labor organization. On March 19, 1991, the IPWU voted to affiliate with the United Electrical, Radio and Machine Workers of America (the "International Union," or "UE"). UE eventually issued a charter to the IPWU, renaming it Local 611 of the International Union, and the IPWU redrafted its bylaws to proclaim itself "United Electrical, Radio and Machine Workers of America (UE) Local 611" (the "Local," or "UE Local 611").

On March 20, 1991, UE International Representative Marion Washington and the local union leadership informed Newell of the affiliation and made a demand to bargain. After initially satisfying itself that the affiliation election was proper, the Company entered into negotiations. Negotiations took place on April 17, April 26, and May 3. The workers' negotiating team consisted of the same local union officers as before the affiliation, as well as UE Field Organizer Lisa Fisher and International Representative Washington, who took over for the IPWU's former lawyer as the workers' chief negotiator.

During the course of negotiations, a dispute developed over the exact identity of the employees' bargaining representative. At the April 26 bargaining session, Washington, as chief negotiator, informed Newell that the affiliated union would not be bound by any of the tentative agreements previously reached between the Company and the IPWU. Also at the April 26 session, Washington proposed a new union recognition clause that gave recognition both to UE and its Local 611. Newell rejected this proposal and suggested that the clause be changed to recognize the IPWU as "affiliated with the UE." The union, through Washington, rejected this suggestion. The Company then expressed concern over what entity actually was representing the workers—the IPWU as affiliated with UE, or the International Union itself. This issue arose again at the May 3 session, as Washington once more rejected Newell's offer to recognize the IPWU as affiliated with the UE. Following this May 3 session, the Company broke off negotiations.

After Newell terminated negotiations, UE and the workers attempted to make demands to bargain in several different ways. On May 14, 1991, Washington wrote the Company, accusing it of refusing to bargain in good faith with UE "as the

collective bargaining representative for the employees," and requesting negotiations on behalf of both UE "and its Local 611." Newell responded on May 16 by expressing its concerns that UE was behaving as if more than an affiliation had taken place, and that the International Union seemed to be unlawfully seeking to supplant and replace the IPWU as the workers' collective bargaining representative. The Company reiterated that it would not negotiate until it could clarify with whom it was negotiating, and with whom it was obligated to bargain.

On May 21, 1991, thirty-eight of Newell's workers petitioned the Company to resume negotiations; the workers identified themselves as the "undersigned members of UE Local 611." On June 17, International Representative Washington wrote the Company requesting negotiations "[o]n behalf of UE Local 611." A week later, five local members of the workers' negotiating team wrote the Company asking it to contact "Mr. Washington to arrange negotiations," but the five did not specify on whose behalf they wrote. On July 19, Washington wrote a particularly confusing letter to Newell in which he requested negotiations once on behalf of both UE "and its Local 611," and then later just on behalf of "UE Local 611." Washington made a final demand to bargain again on behalf of both UE "and its Local 611" on September 18, 1991.

UE initially filed an unfair labor practice charge against Newell on April 25, 1991, after only the first of the three bargaining sessions, but the charge eventually included all of the allegations at issue here. After a hearing on UE's charge, an administrative law judge ("ALJ") held that the Company had violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act (the "NLRA," or "Act"), 29 U.S.C. §§ 158(a)(1) and 158(a)(5). Specifically, the ALJ found that Newell had committed an unfair labor practice by refusing to recognize and bargain with UE Local 611 after breaking off negotiations in May of 1991. Because of findings that (1) the affiliation election had met due process requirements, and (2) substantial continuity existed between the pre- and post-affiliation unions, the ALJ concluded that Newell had an obligation to bargain with UE Local 611 from the date of the affiliation onward.

Upon review, the NLRB did not dispute the finding that the affiliation election was proper, but found nevertheless that Newell had not violated the Act. *Newell Porcelain Co., Inc.*, 307 N.L.R.B. No. 135 (1992). First, the Board found that the Company was justified in breaking off negotiations because it had reasonable grounds to be confused over whether it was negotiating with its workers' certified bargaining representative or another entity. Second, the Board concluded that Newell never had a duty to resume bargaining because UE never allayed the Company's confusion over which entity, the International Union or the Local, was making demands to bargain. Absent a duty to bargain, the Board held that Newell had not violated the Act and dismissed UE's complaint.

This petition for review followed.

## II.

UE makes two arguments in its petition. First, UE argues that substantial evidence does not support the Board's findings that the Company was confused about with whom it was required to negotiate. Second, UE maintains that the Board erred in holding that the Company had no duty to bargain. We address each argument in turn.

## A.

■ UE relies heavily on the ALJ's decision in arguing that substantial evidence cannot support the Board's finding that Newell was confused about which labor organization was attempting to represent its workers. Because the affiliation election was proper, UE argues that the Company knew it had to negotiate with Washington and the other representatives of the affiliated union. An employer can only refuse to negotiate with a properly affiliated union if the employer has reasonable grounds for believing that the union has lost the majority support of the employer's workers. *NLRB v. Financial Institution*

*Employees of America, Local 1182,* 475 U.S. 192, 198, 106 S.Ct. 1007, 1010, 89 L.Ed.2d 151 (1986). UE argues that Newell had no such grounds here, and furthermore, that because negotiations were requested within one year of IPWU's certification, the affiliated union enjoyed an irrebuttable presumption of majority status. *See NLRB v. Curtin Matheson Scientific, Inc.,* 494 U.S. 775, 777–78, 110 S.Ct. 1542, 1544, 108 L.Ed.2d 801 (1990).

While these arguments are technically correct, they are not applicable here. The Board agreed with the ALJ that the affiliation election was proper, and that the Company had, upon proper request, a duty to bargain with the affiliated union. Newell initially fulfilled that duty by negotiating with what it thought was the affiliated union—UE Local 611 as assisted in the negotiations by the International Union—three times in April and May of 1991. We confront, therefore, not a question of majority status, but a question of confused identity and attempted overreaching by the International Union. The issue is simply whether substantial evidence supports the Board's finding that the Company became confused over whether it was actually bargaining with the properly affiliated union or with an uncertified usurper.

■ The Act requires us to treat as conclusive any of the Board's factual findings that are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *see also NLRB v. American Nat'l Can Co., Foster–Forbes Glass Div.,* 924 F.2d 518, 524 (4th Cir.1991). Findings subject to such review may be reversed only if the record is "so compelling that no reasonable factfinder could fail" to disagree. *INS v. Elias–Zacarias,* —— U.S. ——, ——, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992).

■ Substantial evidence supports the Board's finding that the Company was confused about with whom it was negotiating. At the second bargaining session between Newell and the affiliated union, the new UE chief negotiator declared that the affiliated union would not be bound by any of the tentative agreements reached between

the Company and the IPWU, effectively reinitiating the negotiations. This fact alone suggests that Newell was bargaining with an entirely new entity, even though an affiliation does not create a new organization or dissolve an old one. *Financial Institution Employees,* 475 U.S. at 206, 106 S.Ct. at 1015. Also at the second session, Washington demanded that both the International Union *and* its Local 611 be recognized as the workers' certified bargaining representative despite the fact that only the IPWU, since renamed UE Local 611, had been certified. UE's claim that it sought this change only to reflect the new name of the affiliated union rings hollow when we observe that the affiliated union's own bylaws make only UE "Local 611" the new name. Recognizing the International Union as the certified bargaining representative would have bestowed upon UE the Act's wide authority to negotiate all of the workers' conditions of employment, when in fact the workers voted for only the Local to wield this power. *See* 29 U.S.C. § 159(a); *Ford Motor Co. v. Huffman,* 345 U.S. 330, 339, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

Washington also rejected the Company's suggestion to have the clause acknowledge recognition of the IPWU as "affiliated with the UE," the precise relationship that Newell thought the affiliation election had achieved. When this proposed clause was rejected a second time, the Company finally broke off negotiations and sought to clarify with whom it should negotiate. These facts constitute "substantial support" for the finding that Newell was confused over whether it was negotiating with UE Local 611, the affiliated union that was the certified bargaining representative, or the International Union, a completely different entity.

### B.

■ UE also argues that the Board erred in holding that the Company had no duty to bargain after the May 1991 termination of negotiations. Specifically, the Board held that none of the various demands to bargain made by International

Representative Washington and local union members were valid demands, and that without a valid demand to bargain, Newell had no duty to do so. *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 297–98, 59 S.Ct. 501, 504, 83 L.Ed. 660 (1939). UE argues that at least three of the demands were valid and should have triggered Newell's duty to bargain.

UE relies on (1) the May 21 petition signed by thirty-eight members of "UE Local 611;" (2) Washington's June 17 letter requesting negotiations on behalf of only "UE Local 611;" and (3) the June 24 letter sent by local union leaders who did not specifically indicate whether they wrote on behalf of the International Union or the Local. While at least the first two of these communications managed to avoid the confusing transposition of the International Union and the Local, they must be considered along with other communications that perpetuated uncertainty. Washington's May 14 letter to the Company claimed that UE, not the Local, was the workers' collective bargaining representative, and then demanded negotiations on behalf of both the International and the Local. The July 19 letter requested bargaining once on behalf of both UE "and its Local 611," and then on behalf of only the Local. Washington made his final, September 18 demand again on behalf of both the International and the Local.

We agree with the Board that this array of demands did not adequately clarify for Newell that the Local, not the International, was asking to negotiate. Without adequate clarification, none of the demands were valid. To hold that the Board erred, we must be convinced that the Board's conclusions of law were not based upon a reasonable interpretation of the Act, *NLRB v. Southern Maryland Hosp. Center*, 916 F.2d 932, 934–35 (4th Cir.1990), or in other words, that its decision was irrational or inconsistent with the Act. *See Financial Institution Employees*, 475 U.S. at 202, 106 S.Ct. at 1012. We find the Board's conclusion here to be reasonable, rational, and consistent with the Act.

 UE's argument to the contrary ignores both the Board's finding of confusion and the vulnerable position in which this confusion placed the Company. While Newell certainly has a duty to bargain with its workers' certified bargaining representative, 29 U.S.C. § 158(a)(5), this duty is exclusive. It imposes upon the employer a negative duty to bargain with no other entity than the certified bargaining representative. *Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 683–84, 64 S.Ct. 830, 833, 88 L.Ed. 1007 (1944). The exclusivity of the duty to bargain encourages stability in the collective bargaining process by discouraging management from bypassing the employees' chosen representative. The Company thus risked committing an unfair labor practice if it negotiated with a labor organization other than the properly affiliated UE Local 611. *See* 29 U.S.C. §§ 158(a)(1) and 158(a)(2); *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 737–39, 81 S.Ct. 1603, 1607–08, 6 L.Ed.2d 762 (1961) (holding it illegal for an employer to negotiate with a labor organization other than the workers' majority representative, even when the employer believed in good faith that the union enjoyed majority status).

 It is likewise undisputed that local union chapters are separate and distinct entities from their international parents. *Whisper Soft Mills, Inc. v. NLRB*, 754 F.2d 1381, 1385 (9th Cir.1984); *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. NLRB*, 394 F.2d 757, 760–61 (D.C.Cir.1968). While an uncertified international union can, of course, aid a local during the collective bargaining process, it cannot displace it. When Newell became concerned that it was negotiating with the International Union instead of the affiliated UE Local 611, it sought clarification that UE was merely assisting the Local, not seeking to replace it. Although such clarification could have been easily provided, UE failed to do so. *See NLRB v. Insulfab Plastics, Inc.*, 789 F.2d 961, 964 (1st Cir.1986) (noting that an exchange of letters made clear that an affiliated chapter was the bargaining representative, while

the international union was merely assisting the local). Because of this regrettable failure, no negotiations on the significant issues of wages, pensions, and health benefits have taken place, and Newell's workers still have no contract.

■ We agree with the Board that in this situation the Company was not required to put itself at risk by negotiating with the International Union. The onus of demonstrating that UE did not seek to usurp the Local's legitimate role as the workers' certified bargaining representative fell squarely on UE as the uncertified organization attempting to inject itself into the negotiations. *United Auto Workers*, 394 F.2d at 761. It was the International Union that claimed to be the workers' collective bargaining representative and that demanded to be mentioned in the recognition clause. In this atmosphere of confusion, it strikes us as eminently reasonable for the Board to require UE to clarify its role before any of the subsequent demands to bargain could be regarded as valid, especially when many of those demands came from the International Union's Representative and were made on behalf of the International Union. Because no valid demand to bargain had been made, no duty to bargain arose, and no violation of the Act took place.

### III.

Accordingly, UE's petition for review of the order of the NLRB is DENIED.